# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | **CRIMINAL NO.  1:05-CR-10166-DPW** |
| | ) | |
| **SCOTT GREEN** | ) | |
| | ) | |
| **Defendant** | ) | |

## UNITED STATES' SENTENCING MEMORANDUM

The United States, by its attorneys Michael J. Sullivan, United States Attorney for the

District of Massachusetts, and James E. Arnold and George Vien, Assistant United States

Attorneys, submits this Sentencing Memorandum in connection with this matter, which is set for

sentencing on Wednesday, December 14, 2005:

## I.  INTRODUCTION

In this sentencing memorandum, the United States first explains why the determination of

fraud loss as set forth in the presentence report ("PSR") overestimates the amount of ***criminal***

***fraud*** loss for which the defendant should be held accountable under the United States

Sentencing Guidelines ("U.S.S.G.") (Nov. 1, 2005).  As will be discussed, the Government does

not have adequate independent proof to establish by a preponderance of the evidence that ***all*** of

the defendant's billings to the Medicare Program were either:

> (1)     false in that the claims fraudulently represented dates and times of
> phsychotherapy treatments to elderly patients (when no such treatments had
> occurred on those dates and/or for the length of time represented) ***and*** the
> defendant nonetheless caused the claims to be submitted to Medicare; or

> (2)     false in that the claims -- although for treatments actually rendered by the
> defendant -- did not comport with Medicare's reimbursement regulations, ***and***
> that the defendant knew that the claims did not comport with the regulations at the
> time he caused the claims to be submitted.

Absent proof that the claims defendant caused to be submitted falls into one of these categories, the United States submits that such claims, although improper, should not be considered as fraud loss in this case under the applicable sentencing guidelines.

As memorialized in the Sentencing Agreement entered into by the parties (attached as Exhibit 1 to this memorandum) and as discussed in the United States' objections to the Probation Office (see Addendum to PSR), the defendant affirmatively denies knowing the scope of the applicable Medicare rules prior to June 3, 1999.  Moreover, the Government has no direct or circumstantial evidence to establish that, prior to June 3, 1999, defendant Green knew that Medicare's rules did not permit claims for treatments rendered by a Mental Health Counselor (such as defendant) who was consulting with and acting under the supervision of a licensed Medicare-provider, but who was not employed by the licensed-Medicare provider or by the same entity that employed the provider.  Similarly, the Government has no direct or circumstantial evidence to establish that, prior to June 3, 1999, defendant Green knew that Medicare's billing rules did not allow claims for treatments rendered by a Mental Health Counselor who was consulting with and acting under the supervision of a licensed Medicare-provider when that licensed Medicare-provider was not physically on-site to supervise the treatments.  Because the PSR includes such claims submitted prior to June 3, 1999, in its fraud loss estimate, it overestimates the loss to be considered under the Sentencing Guidelines.[1]

---

[1]  Additionally, as will be discussed, the PSR's estimate of fraud loss may overestimate the loss caused by defendant Green in that it fails to give defendant Green credit for monies that were returned to the Medicare Program before the offense was detected, which may, in this case, be required by Application Note 3(E)(i), U.S.S.G. § 2B1.1 (Nov. 1, 2005).

Because the PSR's loss estimate is not supported by the evidence and fails to comport with Sentencing Guidelines, the United States submits that the Court should reject the PSR's loss estimate in this case. Instead, the Government urges the Court to adopt the parties' position as set forth in the Sentencing Agreement and hold that the fraud loss to which the defendant should be held accountable under the Sentencing Guidelines is between $30,001 and $70,000. This finding would result in a Total Offense Level of 10, which, when combined with a criminal history category of I, results in a Zone B sentencing guideline range of 6-12 months. Pursuant to the Sentencing Agreement executed in this case, the United States urges this Court to sentence the defendant to the bottom of this guideline range (which may consist of a term of probation with 6 months' home detention pursuant to U.S.S.G. § 5B1.1).

## II.  BACKGROUND

In order to understand and appreciate the problem with the PSR's loss estimate, it is necessary first to review the regulatory framework concerning Medicare billing in this matter. Given this framework, the Government will then discuss the nature of the defendant's conduct along with certain specific dates that either serve as evidentiary markers as to the defendant's knowledge of Medicare's billing requirements and/or circumstantially support a finding concerning the defendant's fraudulent intent.

A.    Medicare's Rules Pertaining to Psychological Treatments Rendered by Mental Health Counselors

The Medicare Program provides insurance payments for certain psychiatric and psychotherapy services for nursing home-bound Medicare patients if such services were reasonable and necessary, and were performed by certain, specified licensed Medicare providers. (PSR ¶ 11). To participate in the Medicare Program, and therefore bill Medicare for services

3

provided, the Medicare Program requires a health care provider to apply for and receive a

Provider Identification Number ("PIN").  (PSR ¶ 10).  The Medicare Program does not issue

PINs to licensed Mental Health Counselors (such as defendant Green), and thus Mental Health

Counselors are not permitted to bill the program directly for any services rendered to their

patients.  (Id.).  Psychotherapy services rendered by licensed Mental Health Counselors in

connection with the treatment of nursing home-bound patients are not reimbursable by the

Medicare program unless the services are furnished "incident to a physician's professional

service."  See, e.g., 42 C.F.R. § 410.73((b)(2) (1999).

    "Incident to a physician's services" is not defined by Medicare's regulations; however, a

definition can be found in the Medicare Claims Manual.  Section 2050 of the Medicare Claims

Manual explains that "incident to a physician's professional service" requires, *inter alia*, direct

personal supervision of the physician.[2]  Section 2050 also mandates that the individual be an

employee of the physician, which is defined (at section 2050.1C of the Claims Manual) as being

---

[2]  Section 2050.1B of the Medicare Claims Manual clarifies what constitutes "direct
personal supervision":

> If auxiliary personnel perform services outside the office setting, e.g., in a
> patient's home or in an institution, their services are covered incident to a
> physician's service only if there is direct personal supervision by the physician.
> For example, if a nurse accompanied the physician on house calls and
> administered an injection, the nurse's services are covered.  If the same nurse
> made the calls alone and administered the injection, the services are not covered
> (even when billed by the physician) since the physician is not providing direct
> personal supervision.  Services provided by auxiliary personnel in an institution
> (e.g., skilled nursing facility, nursing, or convalescent home) present a special
> problem in determining whether direct physician supervision exists.  The
> availability of the physician by telephone and the presence of the physician
> somewhere in the institution does not constitute direct personal supervision.

someone who is either employed by the physician or by the legal entity employing the physician.

(See generally PSR ¶ 10).

    B.    <u>Defendant's Conduct</u>

The defendant's conduct at issue in this case consisted basically of submitting two types

of Medicare claims:

    (1)    claims that were demonstrably fraudulent in that the claims purported to represent dates and times on which the defendant provided psychotherapy treatments to elderly patients when no such treatments actually occurred on those dates and/or for the length of time represented (hereafter referred to as "fraudulent claims"); and

    (2)    claims that were improper in that the claims -- although for treatments actually rendered by the defendant -- did not comport with Medicare's reimbursement regulations (hereafter referred to as "improper claims").

The circumstances surrounding these claims is discussed below.

    1.    <u>General Description of Defendant's Conduct</u>

As a licensed Mental Health Counselor, defendant Green could not lawfully bill

Medicare directly in connection with psychotherapy services he provided.  (PSR ¶ 12).  Instead,

the defendant made arrangements with various providers (Dr. Mitchell Pulver and Dr. Louis

Frank) to supervise his services, (PSR ¶ 17), and he made arrangements with a third party to

handle the submission of Medicare billings on his behalf, (PSR ¶ 16).

Doing business as Geri-Psychiatric Associates ("GPA"), defendant Green contracted with

various nursing homes to provide psychotherapy services to elderly patients who resided at the

homes.  The defendant advised Drs. Pulver and Frank that he could not bill Medicare directly

and that he needed physician supervision in order to be reimbursed for his services.  (PSR ¶¶ 18,

27).  Both providers agreed to supervise the defendant in exchange for receiving a percentage of

the Medicare billing receipts that the defendant was to receive in connection with his treatment of patients.  (PSR ¶¶ 18, 27).  Drs. Pulver and Frank agreed that the defendant would be responsible for the Medicare billings.  (Id.).  Upon the defendant's request, each gave the defendant's billing agent his respective PIN.  It was understood by both Dr. Pulver and Dr. Frank that the billing agent would submit the provider's name and PIN in connection with Medicare claims submitted on the defendant's behalf.  The doctors further understood, however, that these claims would be limited to only those patients (1) who were actually treated by the defendant and (2) whose treatment plan had been discussed with one of the doctors.  (See id.).

Thereafter, defendant Green treated various patients at the nursing homes.  At various times, the defendant met with Dr. Pulver or Dr. Frank and discussed patient care and other patient-related issues with the doctors.  (PSR ¶¶ 20, 27).  However, at no time was the defendant personally and directly supervised by either physician on-site, nor was the defendant employed by either of the doctors or employed by an entity that employed the doctors.  (PSR ¶¶ 20, 29).

Defendant Green provided his third-party billing agent with the information necessary to submit a Medicare claim.  Specifically, the defendant provided the billing agent with the patient's name, the purported treatment provided, the date on which the purported treatment was provided, and the provider name to be used in connection with these claims.  The billing agent then prepared and submitted the claim.  (PSR ¶ 16).

Defendant Green caused Medicare claims to be submitted using both Dr. Pulver's name and PIN and Dr. Frank's name and PIN.  (PSR ¶¶ 21, 28.  Some of these claims were "fraudulent claims" that misrepresented the number of hours and visits to given patients.  (E.g., PSR ¶¶ 19, 21, 30).  Others of the claims were "improper claims" -- i.e., they accurately reflected

6

the dates and services provided by the defendant to his patients, but were nonetheless improper in that the circumstances underlying the claims did not satisfy Medicare's reimbursement regulations. (E.g., PSR ¶¶ 20, 21, 29, 34).

      2.    Specific Pertinent Dates Relating to Defendant Green's Conduct

To frame the Government's disagreement with the PSR's fraud loss estimate, the following dates are noteworthy:

| | |
|---|---|
| August 1998: | Defendant Green meets with Dr. Louis Frank, who agrees to supervise defendant. Dr. Frank agrees to provide his PIN to the defendant's billing agent and does in fact do so. (PSR ¶ 27). |
| January 1999-February 2000: | Defendant Green meets on a regular basis with Dr. Frank to discuss cases and specific patient-related issues. (PSR ¶ 27). Medicare claims are submitted using Dr. Frank's name and PIN throughout this time period. Some of these claims are "fraudulent claims." (PSR ¶¶ 28, 30). All of the claims are "improper claims" that do not comply with Medicare's rules and regulations. (PSR ¶ 29). |
| May 12, 1999: | Defendant Green applies for a Post Office box in the name of Geri-Psychiatric Associates, LLC in Braintree, Massachusetts, and is assigned Post Office Box 850639. (PSR ¶ 31). |
| June 3, 1999: | Defendant Green causes a change of Information form for Medicare/Federal Health Care Providers to be submitted, which states that Dr. Frank's mailing address and billing address had changed to Post Office Box 850639. Thereafter, all Medicare reimbursement checks submitted in Dr. Frank's name are mailed to the defendant at this address. (PSR ¶ 32). These checks are then deposited into checking accounts under the defendant's control, including a GPA checking account and a checking account that the defendant previously opened under the name of "Benjamin Cooper." (PSR ¶ 33). |
| July 8, 1999: | Defendant Green meets for the first time with Dr. Mitchell Pulver. Dr. Pulver agrees to supervise the defendant in exchange for receiving a percentage of the Medicare billing receipts that the defendant was to receive in connection with his patients. Dr. |

Pulver agrees to provide his PIN to the defendant's billing agent and does in fact do so.  (PSR ¶ 18).

July 20, 1999-
September 14, 1999:    Defendant Green meets with Dr. Pulver to discuss cases and specific patient-related issues.  (PSR ¶ 20).  Medicare claims are submitted using Dr. Pulver's name and PIN throughout this time period.  Some of these claims are "fraudulent claims."  (PSR ¶¶ 19, 21).  All of the claims are "improper claims" that do not comply with Medicare's rules and regulations.  (PSR ¶ 20).

August 1999:    Dr. Pulver receives the first two checks totaling $7,928.07 from Medicare for services that had been billed by defendant Green using Dr. Pulver's name and PIN.  Dr. Pulver writes the defendant a personal check for the two checks.  Because of his concerns about whether the services were properly billed to Medicare, Dr. Pulver does not cash the two checks.  (PSR ¶ 22).

September 12, 1999:    Dr. Pulver meets with the defendant and expresses concerns about the applicable procedures permitted by Medicare regulations concerning supervising and billing non-physicians.  Dr. Pulver advises the defendant that he will be contacting Medicare for clarification.  Dr. Pulver endorses and gives various Medicare checks to the defendant with the understanding that the defendant's acceptance of the checks is contingent upon the billings being in compliance with Medicare regulations.  (PSR ¶ 23).

September 13, 1999:    Dr. Pulver contacts Medicare to verify whether defendant Green's billings are in compliance with Medicare's applicable regulations.  (PSR ¶ 24).

September 15, 1999:    Dr. Pulver learns from a Medicare representative that defendant Green's billings are not permitted by Medicare regulations and that the funds need to be returned. (PSR ¶ 24).

Dr. Pulver advises the defendant that he is not following applicable Medicare regulations in connection with his billings.  Dr. Pulver tells the defendant that the funds received from Medicare using Dr. Pulver's name and PIN need to be returned.  (PSR ¶ 25).

Dr. Pulver pays back to the Medicare program $18,433.87 and the defendant gives approximately $11,000 back to Dr. Pulver.  (PSR ¶ 25).

<u>March 14, 2000</u>:    Dr. Frank sends the defendant a certified letter formally notifying the defendant that Dr. Frank was terminating their arrangement. (PSR ¶ 27).

C.    <u>The PSR's Estimated Fraud Loss</u>

The Probation Office in the preliminary PSR estimated $93,562.87 as being the intended fraud loss to the Medicare Program caused by the defendant. (PSR ¶ 43). In determining this figure, the Probation Office included all of the "fraudulent claims" that defendant Green caused to be submitted. (PSR ¶¶ 34, 36). The Probation Office also included in its loss estimate all of the "improper claims" that the defendant caused to be submitted. (<u>Id.</u>). In so doing, the Probation Office never discussed nor distinguished between two types of "improper claims":

(1)    those "improper claims" for which there is evidence suggesting that the defendant caused claims to be submitted *despite his knowledge that the claims were improper*; and

(2)    those "improper claims" that the defendant caused to be submitted *for which there is no evidence to indicate that defendant knew that the claims were improper.*

Additionally, the Probation Office's loss estimate did not take into account the monies paid back to the Medicare Program by Dr. Pulver.

After disclosure of the preliminary PSR, the Government submitted objections to the preliminary PSR's loss estimate. (<u>See</u> Addendum to PSR). The Government noted that the preliminary PSR did not distinguish between those "improper claims" that were submitted *prior* to the date on which the Government's evidence indicated that defendant understood what Medicare's rules and regulations were, and those claims submitted *after* the date on which the evidence indicated that the defendant knew what he was doing was wrong. Citing <u>United States v. Schaefer</u>, 291 F.3d 932, 939-40 (7th Cir. 2002) and <u>United States v. Peterson</u>, 101 F.3d 375,

9

385 (5th Cir. 1996), the Government noted that the courts have held that relevant conduct under

the sentencing guidelines includes only ***criminal conduct***.  Because criminal conduct in this case

required evidence of the defendant's intent to defraud and the Government did not possess

evidence of this *mens rea* with respect to all of the "improper claims," the Government urged

that the fraud loss estimate be reduced.  The Government also noted that the fraud loss estimate

in the preliminary PSR did not account for monies returned to the Medicare Program prior to

detection of the offense and was therefore potentially inconsistent with Application Note 3(E)(i),

U.S.S.G. § 2B1.1 (Nov. 1, 2005); for this reason as well, the Government urged the Probation

Office to reduce the PSR's fraud loss estimate.

The Probation Office rejected both of the Government's arguments.  (Addendum to the

PSR, at 4-5).  First, the Probation Office disagreed with the Government's views concerning the

defendant's knowledge of Medicare's billing regulations, stating "The Probation Office believes

that the defendant should have been fully apprised of the policies and procedures of the

Medicare Program in light of his responsibilities with Geri-Psychiatric Associates of Weymouth,

MA."  (Id., at 4).  As a factual matter, the Probation Office argued that the facts supported an

inference that the defendant knew from the outset that the "improper claims" were, in fact,

impermissible:

> It appears clear that Green's lack of honesty is shown by his submitting bills
> without the doctors knowledge and by submitting a change of information form
> without Dr. Frank's knowledge which changed the doctor's address to a Post
> Office Box which the defendant opened under an alias.  The defendant then
> directed payments be sent to the Post Office box that he later deposited into a
> personal account.  ***All of the above took place after being informed by Dr. Pulver***
> ***that this type of billing was not permitted by Medicare regulations.***

10

(Id.) (emphasis added).  Finally, the Probation Office rejected the recommendation that the fraud loss attributable to the defendant be reduced by the amounts of monies returned to the Medicare Program prior to detection of the defendant's criminal conduct.  (Id., at 5).

## IV.  ARGUMENT

The Government maintains that the evidence in this case only supports a fraud loss of between $30,001 and $70,000.  In calculating the defendant's fraud loss at $93,562.87, the Government believes that the Probation Office considered all of the "improper claims" irrespective of whether the Government could establish defendant's conduct was committed knowingly and was, hence, criminal.  Moreover, the Government is concerned that, under the circumstances of this case, the Probation Office may have inappropriately failed to give defendant credit for monies that were returned to the Medicare Program prior to the Program having detected the defendant's criminal conduct. For all of these reasons, the Government urges the Court to find that the losses for which the defendant should be held accountable was between $30,001 and $70,000.

    A.    The PSR's Fraud Loss Estimate Improperly Considers "Improper Claims" For Which the Government Cannot Establish Defendant's Knowledge and/or Intent

Defendant Green's billings in this case consist of two distinct categories of conduct -- "fraudulent claims" and "improper claims" -- each of which must be considered separately.  Both the Government and the defendant agree that all "fraudulent claims" should be included in the estimated fraud loss.  However, with respect to the "improper claims," the Government and the defendant both agree that consideration of this subset of claims should be limited to only those claims for which there is some evidence (direct or circumstantial) that the defendant was trying to cheat the Medicare Program at the time of the claims' submission.

Because the "improper claims" involved actual treatments rendered by the defendant with, at times, off-site supervision from either Dr. Pulver or Dr. Frank, the issue pertaining to these claims is whether the defendant knew that submission of these claims was inconsistent with the Medicare Program's rules. The defendant affirmatively denies (and the Government does not have sufficient evidence to suggest otherwise) that his conduct with respect to *all* of the "improper claims" was knowing and intentional. Phrased differently, the defendant denies (and the Government cannot establish to the contrary) that the defendant's conduct with respect to *all* of the "improper claims" constituted violations of criminal law (rather than merely civil or administrative violations). Absent such evidence, the case law suggests that it is improper to consider *all* of the "improper claims" in calculating fraud loss. See, e.g., United States v. Schaefer, 291 F.3d 932, 939-40 (7th Cir. 2002) (limiting relevant conduct under U.S.S.G. § 1B1.3 to criminal conduct in determining fraud loss); United States v. Peterson, 101 F.3d 375, 385 (5th Cir. 1996) ("For conduct to be considered 'relevant conduct' for the purpose of establishing one's offense level that conduct must be criminal.").

Simply put, the Government cannot establish by a preponderance of the evidence in this case that the defendant acted with an intent to defraud the Medicare Program with respect to *all* of the losses in the PSR. The PSR, in concluding that the Government has such evidence, draws erroneous conclusions from the evidence in this case and draws inferences that the Government cannot support.

In reaching its contrary conclusion, the Probation Office made an erroneous assumption and several factual errors. First, the Probation Office *assumes* that defendant Green knew the Medicare Program's rules by virtue of his employment at Geri-Psychiatric: "[t]he Probation

Office **believes** that the defendant **should** have been fully apprised of the Medicare program in light of his responsibilities with Geri-Psychiatric Associates," (Addendum, at 4) (emphasis added). However, the defendant denies this fact and the available facts do not support this assumption. As noted in the PSR, defendant Green was not responsible for handling Medicare billing; a third-party billing agent handled the Medicare billings for the company. (See PSR ¶ 16). Defendant Green only provided the requisite treatment (or purported treatment) information to the billing agent. (Id.) The billing agent, in turn, was then responsible for determining the proper manner in which to bill Medicare. (Id.)

Additionally, the Probation Office is simply factually incorrect when it suggests that all of the "improper claims" involving Dr. Frank took place **after** defendant Green was informed by Dr. Pulver as to what claims were permitted under Medicare's regulations. The Probation Office is equally in error when it states that defendant Green submitted the change of address form for Dr. Frank's billing **after** the same conversation with Dr. Pulver. As discussed supra,

    (1)    defendant Green first met with Dr. Frank in August 1998 and defendant Green caused "improper claims" involving Dr. Frank's PIN to be submitted sometime after that date through early 2000 (PSR ¶ 27);

    (2)    defendant Green caused the change of address form pertaining to Dr. Frank's reimbursements to be submitted on or about June 3, 1999, (PSR ¶ 32); and

    (3)    Dr. Pulver's conversation with defendant Green concerning the applicable Medicare regulations did not take place until on or about September 15, 1999, (PSR ¶ 25).

In other words, a considerable portion of the "improper billings" involving Dr. Frank occurred **before** defendant Green's discussion with Dr. Pulver, not **after** the discussion as suggested by the Probation Office.

For this reason the Government maintains that some portion of the "improper claims" should not be included in the fraud loss determination for purposes of determining the defendant's sentencing guidelines.  As set forth in the Sentencing Agreement between the parties, it appears that the proper demarcation date with respect to the defendant's knowledge is on or about June 3, 1999, the date on which defendant Green surreptitiously submitted the change of address form with respect to the address for Medicare reimbursement checks to be sent to Dr. Frank.

      B.      <u>The PSR's Fraud Loss Estimate May Be Improperly Failing to Give Defendant Credit for Monies Returned to the Medicare Program Prior to Detection of Defendant's Misconduct</u>

In the Government's response to the preliminary PSR, the Government observed that the preliminary PSR failed to give the defendant credit for the monies that were returned by Dr. Pulver to the Medicare Program and for which the defendant partially reimbursed Dr. Pulver. The Probation Office rejected this observation, stating that "one must consider not only actual loss but also intended loss" and that the monies returned by Dr. Pulver and partially reimbursed by the defendant are properly considered only when determining restitution.  (Addendum, at 5).

As the Government advised the Probation Office, the Government has no objection in this case to a calculation of the applicable sentencing guideline loss figure that does not include the monies returned by Dr. Pulver to the Medicare Program, which monies were partially reimbursed by the defendant.   Application Note 3(E)(i), U.S.S.G. § 2B1.1, provides that any monies returned to victim before the offense was detected by the defendant or other persons acting jointly with the defendant be deducted from the calculation of loss.  Specifically, Application Note 3(E) provides, *inter alia:*

(E)     <u>Credits Against Loss</u>.--Loss shall be reduced by the following:

   (i)     The money returned ... by the defendant or other persons
           acting jointly with the defendant, to the victim before the
           offense was detected.  The time of detection of the offense
           is the earlier of (I) the time of the offense was discovered
           by a victim or government agency; or (II) the time the
           defendant knew or reasonably should have known that the
           offense was  detected by a victim or government agency.

In this case, there is no dispute that the monies returned by Dr. Pulver and partially reimbursed by the defendant occurred prior to detection by the Medicare Program of the defendant's criminal conduct.  Dr. Pulver contacted the Medicare Program on his own initiative and repaid the monies ($18,443.87 -- consisting of two uncashed checks worth $7,928.07 and personal checks totaling $10,515,80) immediately upon learning that the billings were not consistent with the Medicare regulations.  (PSR ¶¶ 24, 25).  The defendant subsequently made partial repayment to Dr. Pulver of approximately $11,000.  (PSR ¶ 25).

In refusing to credit the defendant with this repayment, the Government believes that the Probation Office may have unnecessarily focused on "intended loss," whereas Application Note 3(E) uses the term "loss."  "Loss" under U.S.S.G. § 2B1.1 specifically includes both "actual loss" and "intended loss."  <u>See</u> Application Note 3(A) ("loss is the greater of actual loss or intended loss").  Accordingly, by virtue of the Sentencing Commission's use of the term "loss" in Application Note 3(E), it appears that credit is due for repayments made prior to detection of the victim, irrespective of whether the loss being considered is "actual loss" or "intended loss." <u>Cf.</u> Application Note 8(b), U.S.S.G. § 2F1.1 (Nov. 1, 2000) (bank fraud loss is "the amount of the loan not repaid at the time the offense is discovered"); <u>United States v. Bennett</u>, 37 F.3d 687, 695 (1st Cir. 1994) (refusing to give credit where defendant repaid money after detection").

C.    <u>Defendant Should Be Held Accountable for Losses Between $30,001 and $70,000</u>

The Government has consistently maintained that the defendant should be held accountable for causing losses to the Medicare Program ranging between $30,001 and $70,000 as a result of his criminal conduct and has memorialized this position in the Sentencing Agreement with the defendant.  (<u>See</u> Exhibit 1).

As the Government sought to explain in its original submission to the Probation Office, estimating fraud loss is complicated in this case by virtue of the fact that it is nearly impossible as a matter of historical record to determine which claims submitted on the defendant's behalf were "fraudulent claims" as opposed to merely "improper claims."  That is, it is exceptionally difficult to determine with respect to any given claim whether the claim was fictitious and not reflective of any services by the defendant, or whether the claims was merely an "improper claim" for which services were actually rendered, but could not be permissibly billed to the Medicare Program.

The Government's best estimate is that the defendant caused losses ranging between $30,001 and $70,000 as a result of his criminal conduct.  This estimate is determined as follows.

1.    <u>Defendant caused estimated losses in excess of $43,037.21 in connection with Medicare claims using Dr. Frank's PIN</u>

The Government estimates that the defendant knowingly and intentionally caused losses to the Medicare Program somewhere in excess of $43,037.21 while using Dr. Louis Frank's PIN.

As previously discussed, the Government has no evidence establishing that, at the outset of his relationship with Dr. Frank, the defendant knew and understood that it was impermissible to bill the Medicare Program for claims involving actual treatments rendered by the defendant in which the defendant consulted with and reviewed the course of treatment with Dr. Frank.

16

However, by some point in time and not later than June 3, 1999 (when the defendant surreptitiously submitted a Change of Information form for Medicare/Federal Health Care Providers changing Dr. Louis Frank's mailing address and billing address to a mail box that the defendant had previously opened), the evidence suggests that the defendant became aware that his conduct was not authorized.

From this date forward, the defendant caused the Medicare Program to pay claims totaling $43,037.21 using Dr. Frank's PIN.  This figure consists both of payments for "fraudulent claims" and "improper claims."[3/]

With respect to the claims using Dr. Frank's PIN that the defendant caused the Medicare Program to pay *prior* to June 3, 1999 (totaling $30,434.84), there is no question that some of those claims were knowingly false and fraudulent.  However, the evidence also suggests that some other portion of those claims represented actual treatments rendered by the defendant with consultations between the defendant and Dr. Frank.  It is difficult, if not impossible, to determine with respect to any given claim during this time period whether it represents an actual treatment rendered by the defendant or whether it represents a claim for which no services were rendered.

2.    Defendant should be held accountable for estimated losses of at least $9,585.02 in connection with Medicare claims using Dr. Pulver's PIN

The Government estimates that the defendant should be held accountable for at least $9,585.02 in estimated losses to the Medicare Program in connection with Medicare claims

---

[3/] Of this amount, $24,912.41 represents the amount of claims submitted to Medicare on defendant Green's behalf using Dr. Frank's PIN on or after September 15, 1999 -- the date on which defendant Green learned from Dr. Pulver that any such billing to the Medicare Program was impermissible.

submitted using Dr. Mitchell Pulver's PIN.  This estimated loss includes losses of $1,656.95 to

the Medicare Program and $7,928.07 in losses to Dr. Mitchell Pulver.

All of the claims (totaling $20,090.82) submitted using Dr. Pulver's PIN were submitted

after June 3, 1999, and therefore could potentially be considered within the loss calculation.

However, as discussed, Dr. Pulver, on his own initiative, discovered that the Medicare program

did not allow for claims for treatments rendered by a Mental Health Counselor unless the Mental

Heath Counselor was both acting under the direct supervision of Medicare-eligible medical

providers and was employed either by the provider or by the legal entity employing the provider.

Because Dr. Pulver's arrangement with the defendant did not meet these requirements, Dr. Pulver

returned two uncashed Medicare checks totaling $7,928.07 to the Medicare program and paid

$10,515.80 to the Medicare program using his own personal checks.  In sum, Dr. Pulver returned

to the Medicare Program $18,433.87.  The defendant, who had received the proceeds from all the

claims including the $7,928.07 represented by the two uncashed Medicare checks, subsequently

repaid Dr. Pulver roughly $11,000.  As a result, Dr. Pulver lost $7,928.07 due to the defendant's

criminal conduct and the Medicare Program lost $1,656.95.

      3.     <u>Total Estimated Losses Resulting from Defendant's Criminal Conduct</u>

Combining the two sets of losses, the Government submits that the evidence supports an

estimate that the defendant knowingly and intentionally caused a fraud loss of between $30,001

and $70,000.  As discussed above, the evidence supports the conclusion that at least $43,037.21

of the losses to the Medicare Program using Dr. Frank's PIN were knowing and intentional.  (As

previously stated, this figure includes both "fraudulent claims" for which services were falsely

represented and "improper claims" relating to actual services provided that were not

reimbursable by the Medicare Program.)  Similarly, the losses incurred by Dr. Pulver ($7,928.07) and to the Medicare Program from the defendant's use of Dr. Pulver's PIN ($1,656.95) are also directly attributable to the defendant.  Together, these losses total $52,622.23.  Additionally, the Government submits that the evidence supports the conclusion that some portion of the remaining $30,434.80 in claims paid by Medicare (prior to June 3, 1999) using Dr. Frank's PIN should also be counted, as they represent claims that did not accurately reflect treatments that were actually rendered.  However, the Government has no means by which to establish that more than $17,377.77 of those claims were in fact "fraudulent claims."[4] Because of this, the Government believes that a conservative estimate of the losses caused by defendant's criminal conduct is best captured by the $30,001 - $70,000 range.

## V.  CONCLUSION

The Court should adopt the Sentencing Agreement in this case and hold defendant Green accountable for causing estimated losses of between $30,001 and $70,000 as a result of his criminal conduct.  With this finding, the Court should conclude that the defendant's Total Adjusted Offense Level is 10, his Criminal History Category is I, and his guideline range within Zone B is between 6 and 12 months.

The Government submits that consideration of all the factors in 18 U.S.C. § 3553(a) warrants imposition of a sentence at the bottom of the guidelines in this matter.  The events at issue occurred in 1999 and 2000, and the Government has no evidence of any misconduct by the defendant since that date.  The defendant was, throughout the Government's investigation,

---

[4]  In order to hold the defendant accountable for $70,000 or more in losses, the Government would need to establish that at least $17,377.77 ($70,000 minus $52,622.23) of these claims were fraudulent.

cooperative.  Upon being notified of the Government's investigation, the defendant sought to

resolve the matter.  The defendant executed multiple statute of limitations tolling agreements to

provide the Government with time to complete its investigation.  The defendant agreed to plead

guilty without return of an Indictment.  The defendant executed a Sentencing Agreement in

which he has agreed to pay full restitution, thereby acknowledging that his conduct (regardless

of whether deemed criminal or merely "improper") was wrong.

For all of these reasons, the Government recommends to the Court that the defendant be

sentenced to the bottom of the sentencing guidelines:  namely, to a term of probation involving 6

months home confinement.

Respectfully submitted,

MICHAEL J. SULLIVAN
United States Attorney

By:    /s/ James E. Arnold
       James E. Arnold
       George Vien
       Assistant U.S. Attorneys
       One Courthouse Way, Suite 9200
       Boston, MA 02210
       (617) 748-3603

Dated: December 13, 2005

<u>CERTIFICATE OF SERVICE</u>

This is to certify that I have this day served upon counsel for the defendant a copy of the foregoing document by electronic mail to the following:

Mark Smith, Esquire
Laredo Smith LLP
15 Broad Street
 Suite 600
Boston, MA 02109
smith@laredosmith.com

/s/ James E. Arnold
James E. Arnold
Assistant United States Attorney

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| ) | CRIMINAL NO. 1:05-10166-DPW |
| V.                              ) | |
| ) | |
| SCOTT GREEN,                    ) | |
| ) | |
| Defendant.            ) | |
| _____ ) | |

## SENTENCING AGREEMENT

The United States of America, by its attorneys, Michael J. Sullivan, United States

Attorney for the District of Massachusetts, James E. Arnold, Assistant U.S. Attorney, and

George Vien, Assistant U.S. Attorney (hereafter referred to as "the United States Attorney"

or "the Government," and defendant Scott Green ("the Defendant"), by his attorney, Mark

D. Smith, Esq., acknowledge the following sentencing agreement:

## PENALTIES AND RESTITUTION

1.     Defendant Scott Green has been convicted of one count of mail fraud in

violation of 18 U.S.C. § 1341.

> The statutory maximum penalty under 18 U.S.C. § 1341 (mail fraud): five
> years incarceration; a three year period of supervised release; a fine of
> $250,000 or twice the gross gain or loss involved in the offense, whichever
> is greater; and a special assessment of $100.00.

> Additionally, defendant faces a mandatory order of restitution pursuant to
> 18 U.S.C. § 3663A.

> With respect to supervised release, if Defendant is placed on supervised
> release following imprisonment and violates one or more of the conditions
> of supervised release, defendant may be returned to prison for all or part of

the term of supervised release, which could result in Defendant's serving a total term of imprisonment greater than the statutory maximum of your imprisonment. 18 U.S.C. § 3583.

## SENTENCING FACTORS AND FACTUAL BASIS

2.     The sentence to be imposed upon Defendant is within the discretion of the sentencing judge, subject to the statutory maximum penalties set forth above, and the provisions of the Sentencing Reform Act and the United States Sentencing Guidelines promulgated thereunder, as modified by United States v. Booker and United States v. Fanfan, 125 S.Ct. 738 (2005). In imposing the sentence, the sentencing judge must consult and take into account the United States Sentencing Guidelines, along with the other factors set forth in 18 U.S.C. § 3553(a).

3.     The parties agree that the attached factual basis accurately reflects Defendant's criminal conduct, and Defendant admits that he engaged in the conduct set forth in the attached factual basis.

4.     The parties agree to take the following positions at sentencing with respect to the application of the United States Sentencing Guidelines:

(a)     The parties agree to take the position that the court should consider the November 1, 2005, version of the United States Sentencing Guidelines manual.

(b)     The parties agree to take the position that the applicable sentencing guideline is the fraud guideline, U.S.S.G. § 2B1.1, which has a base offense level of 6. U.S.S.G. § 2B1.1(a)(2) (Nov. 1, 2005).

(c)     The parties agree to take the position that Defendant knowingly and intentionally caused a fraud loss to the Medicare program in excess of $30,000 and less than $70,000 and that his offense level should therefore be

2

increased by six (6) levels pursuant to U.S.S.G. § 2B1.1(b)(1)(D) (Nov. 1, 2005).

In calculating the loss, the parties agree and Defendant stipulates that he caused improper billings to the Medicare program totaling $93,562.87. Of this amount, however, Defendant maintains (and the Government has no evidence to suggest to the contrary) that at least until on or about June 3, 1999, Defendant was not aware that:

    (i)    the Medicare billing rules did not allow billings when a Mental Health Counselor, who was consulting with and acting under the supervision of a licensed Medicare-provider, was not employed by the licensed-Medicare provider or was not employed by the same entity that employed the provider; and

    (ii)    that the Medicare billing rules did not allow billings when a Mental Health Counselor, who was consulting with and acting under the supervision of a licensed Medicare-provider, treated patients but the licensed Medicare-provider was not physically on-site to supervise the Mental Health Counselor's activities.

The parties further agree to take the position that approximately $11,000 of the false or improper billings that Defendant caused to be submitted using the PIN of Dr. Mitchell Pulver should not be considered in determining fraud loss pursuant to Application Note 3(E)(i), U.S.S.G. 2B1.1 (Nov. 1, 2005). The parties agree that Dr. Pulver initiated contact with the Medicare program to determine the billing rules and that after Dr. Pulver determined that the billings using his PIN did not meet the Medicare requirements, Dr. Pulver immediately reimbursed the Medicare program $18,433.87 for these claims. The parties further agree that Defendant repaid Dr. Pulver $11,000 in connection with these repayments, and that Defendant made these repayments before the instant investigation commenced.

(d)    The parties agree to take the position that no role in the offense enhancement is appropriate pursuant to U.S.S.G. § 3B1.1 (Nov. 1, 2005). Although Defendant gave instructions and directions to Debra Hartley with respect to billings, Ms. Hartley was not a criminal participant in that she was not aware that Defendant was knowingly and intentionally submitting false claims to the Medicare Program.

(e)    Based on Defendant's prompt acceptance of personal responsibility for the offense(s) of conviction in this case, and information known to the U.S. Attorney at this time, the U.S. Attorney agrees to recommend that the Court reduce by two (2) levels Defendant's Adjusted Offense Level under U.S.S.G. § 3E1.1 (Nov. 1, 2005).

The U.S. Attorney specifically reserves the right not to recommend a reduction under U.S.S.G. § 3E1.1 if, at any time between execution of this Agreement and sentencing, Defendant:

    (i)    Fails to admit a complete factual basis for the plea;

    (ii)    Fails to truthfully admit his conduct in the offenses of conviction;

    (iii)    Falsely denies, or frivolously contests, relevant conduct for which Defendant is accountable under U.S.S.G. § 1B1.3;

    (iv)    Fails to provide truthful information about his financial status;

    (v)    Gives false or misleading testimony in any proceeding relating to the criminal conduct charged in this case and any relevant conduct for which Defendant is accountable under U.S.S.G. § 1B1.3;

    (vi)    Engages in acts which form a basis for finding that Defendant has obstructed or impeded the administration of justice under U.S.S.G. § 3C1.1;

    (vii)    Intentionally fails to appear in Court or violates any condition of release;

    (viii)    Commits a crime;

    (ix)    Transfers any asset protected under any provision of this Agreement; and/or

    (x)    Attempts to withdraw his guilty plea.

Defendant expressly understands that, in addition to declining to recommend an acceptance-of-responsibility adjustment, the Government

4

may seek an upward adjustment pursuant to U.S.S.G. § 3C1.1 if Defendant obstructs justice after date of this Agreement.

5.    Based on the above, Defendant's sentencing guideline factors are as follows:

Base Offense Level ...................................... <u>6</u>
Fraud loss enhancement ............................... <u>6</u>
Acceptance of Responsibility ....................... <u>-2</u>

Total ............................................................. <u>10</u>

Based upon the knowledge now known to the parties with respect to Defendant's criminal record, it is believed that Defendant falls within Criminal History I.

6.    Defendant agrees to pay all special assessments at or before the time of sentencing.

7.    The Defendant agrees that an order of restitution must be imposed in this case pursuant to 18 U.S.C. § 3663A and Defendant further agrees that the order of restitution in this case should be in the amount of $81,547.07. Of this amount, $73,619 should be made payable to the Medicare Trust Fund, c/o CMS, Division of Premium Billing and Collections, P.O. Box 7520, Baltimore, MD 21207-0520. Defendant acknowledges that, as a result of his conduct, the Medicare Program suffered losses totaling $73,619 (after taking into consideration the funds previously reimbursed by Dr. Mitchell Pulver and $1,500 that defendant paid to the Medicare Trust Fund on November 12, 2005). Defendant recognizes that this figure includes losses arising from his knowingly and intentionally causing fraudulent claims to be filed with Medicare, and that

this figure also includes losses arising from those claims Defendant caused to be submitted prior to learning that the Medicare Program did not allow for claims to be submitted when a Mental Health Counselor treated patients, but was not acting under the direct, on-site supervision of Medicare-eligible medical providers and/or was not employed either by those providers or by the legal entity employing those providers.

Defendant further agrees to pay restitution in the amount of $7,928.07 to Dr. Mitchell Pulver, 24 Bradford Road, Needham, MA 02492, for those additional Medicare funds received by Defendant that Dr. Pulver repaid to the Medicare Program.

Pursuant to 18 U.S.C. § 3663A(a)(3), Defendant agrees to the entry of an order requiring restitution in these amounts. Defendant understands and agrees that these amounts are in excess of the amounts resulting from his criminal conduct alleged in Count One of the Information, and that these amounts reflect monies due and owing as a result of billings caused to be submitted by Defendant.

8.    The Government agrees to take the position that Defendant be sentenced to the bottom of the applicable sentencing guideline range as determined by the Court at sentencing. Defendant reserves the right to request that the sentencing judge impose a sentence lower than that dictated by the Sentencing Guidelines and to argue that such a lower sentence will result in a reasonable sentence pursuant to United States v. Booker. The Government reserves the right to oppose this argument.

9.    Defendant further understands that the sentencing judge is not bound by the Government's and is under no obligation to accept the Government's recommendation

regarding the sentence to be imposed upon Defendant. Additionally, Defendant understands that even if the sentencing judge ignores the Government's recommendation and/or imposes any sentence up to the maximum established by statute, Defendant cannot for that reason alone withdraw this sentencing agreement. Defendant further understands that neither the Government, his attorney, nor the sentencing judge, can make a binding prediction or promise, regarding the sentence that Defendant will receive in this case.

10.    Defendant understands and agrees that neither the United States Probation Office nor the sentencing judge is bound by the stipulations referenced in this agreement, and that the sentencing judge will, with the aid of the presentence report, determine the facts and calculations relevant to sentencing. Defendant further understands that both he and the U.S. Attorney are free to supply relevant information to the United States Probation Office, and the U.S. Attorney specifically reserves its right to correct any and all factual misstatements relating to the calculation of your sentence. Defendant understands that the sentencing judge cannot rely exclusively upon the parties' stipulation in ascertaining the factors relevant to the determination of Defendant's sentence. Rather, in determining the factual basis for this sentence, the sentencing judge will consider the stipulation, together with the results of the presentence investigation, and any other relevant information. Defendant understands that if the sentencing judge ascertains factors different from those contained in the stipulation, Defendant cannot, for that reason alone, withdraw from this Sentencing Agreement.

7

11.    This agreement does not affect in any way the right of this Office, under 18 U.S.C. § 3742, to appeal the sentence imposed by the Court.

12.    Unless otherwise provided, this Sentencing Agreement is binding only upon the Government as defined hereinabove, and does not bind any other United States Attorney, nor any state or local prosecutor.

This agreement shall be effective upon execution by the Defendant and the Government.

AGREED AND ACCEPTED

MICHAEL J. SULLIVAN
UNITED STATES ATTORNEY

DIANE C. FRENIERE
Section Chief, White Collar Crime
Assistant United States Attorney

JAMES E. ARNOLD
GEORGE VIEN
Assistant United States Attorneys


I have read this agreement and have carefully reviewed every part of it with my attorney. I understand the terms of this agreement, and I voluntarily agree to each of the terms. Before signing this agreement, I consulted with my attorney. My attorney fully advised me of my rights, of possible defenses, of the Sentencing Guideline provisions, and of the consequences of entering into this agreement. No other promises or inducements have been made to me, other than those contained in this agreement.

8

Furthermore, no one has threatened or forced me in any way to enter into this agreement. Finally, I am satisfied with the representation of my attorney in this matter.

_____12/13/2005_____

Date

_____Scott Green_____

SCOTT GREEN
Defendant

    I am Scott Green's attorney. I have carefully reviewed every part of this agreement with my client. Further, I have fully advised my client of his rights, of possible defenses, of the Sentencing Guideline provisions, and of the consequences of entering into this agreement. To my knowledge, my client's decision to enter into this agreement is an informed and voluntary one.

_____1 2 - 13 - 05_____

Date

_____Mark D. Smith_____

MARK D. SMITH, ESQ.
Attorney for Defendant

9

## STATEMENT OF FACTS

### I.    Background Concerning the Medicare Program

1.    The Medicare Program is administered and supervised by the Department of Health and Human Services ("HHS"), an agency of the United States.  Within HHS, the Centers for Medicare and Medicaid Services ("CMS"), formerly known as the Health Care Financing Administration ("HCFA") is directly responsible for administration of the Medicare Program. CMS (and HCFA) in discharging its responsibilities, contracted with private insurance companies, known as fiscal intermediaries and carriers, to receive, review, and pay appropriate claims for reimbursement for the provision of care to Medicare Program beneficiaries.

2.    In Massachusetts, the Medicare program was administered by the National Heritage Insurance Company ("National Heritage") of Hingham, Massachusetts.  National Heritage was responsible for receiving, reviewing, approving and paying claims filed by providers of Medicare services.  National Heritage paid providers by remitting proceeds either by wire transfer or by mailing checks to the Medicare providers.  Medicare reimbursed National Heritage for the claims it paid.

3.    To participate in the Medicare program and therefore bill Medicare for services provided, a health care provider was required to apply for and receive a Provider Identification Number ("PIN").  Without a PIN, a health care provider was not authorized to bill the Medicare program and could not receive payments for services rendered.  The Medicare program did not issue PINs to health care professionals who were licensed Mental Health Counselors.  Psychiatric or psychotherapy services rendered by licensed Mental Health Counselors in connection with the treatment of nursing home-bound patients were not reimbursable by the Medicare program, unless the Mental Health Counselors were both acting under the direct supervision of Medicare-eligible medical providers and were employed either by those providers or by the legal entity employing those providers.

4.    The Medicare program provided insurance payments for certain psychiatric and psychotherapy services for nursing home bound Medicare patients if such services were reasonable and necessary, and were performed by certain, specified licensed Medicare providers.

### II.    The Defendant and His Criminal Conduct

5.    Defendant **SCOTT GREEN** was licensed by the Commonwealth of Massachusetts as a Mental Health Counselor.  As a Mental Health Counselor, defendant **SCOTT GREEN** was not eligible to obtain a PIN to bill Medicare, and at no time did the Medicare Program issue a PIN to defendant **SCOTT GREEN**.  As a result, defendant **SCOTT GREEN** was not authorized to bill Medicare directly for any services he provided.

1

6.    On or about February 10, 1998, Geri-Psychiatric Associates (hereinafter referred to as "GPA") of Weymouth, MA, and Lexington, MA, was created by Dr. Lalith Tissera, Dr. Rahim Shafa, and defendant **SCOTT GREEN**.  GPA was a limited liability company licensed to render psychotherapy and psychiatric services.  GPA was legally dissolved on or about July 21, 1999.

7.    From its creation, defendant **SCOTT GREEN** served as the Manager and President of GPA.  As the manager of GPA, defendant **SCOTT GREEN** was responsible for the marketing of GPA's services.  After GPA was legally dissolved, defendant **SCOTT GREEN** continued to do business as GPA.

8.    During 1998 and 1999, defendant **SCOTT GREEN**, doing business as GPA, made arrangements with various nursing homes, including West Roxbury Manor, Baypointe Rehabilitation and Skilled Care Center, and Briarwood Healthcare Nursing Center, to provide psychiatric and psychotherapy services to elderly patients who resided at the nursing homes.

9.    Defendant **SCOTT GREEN** made arrangements with Debra Hartley, a non-employee billing agent, to handle the Medicare billings for GPA in connection with any and all services that GPA provided at West Roxbury Manor, Baypointe Rehabilitation and Skilled Care Center and Briarwood Healthcare Nursing Center.  Acting at defendant **SCOTT GREEN**'s direction, Hartley was responsible for completing and submitting Medicare reimbursement claims for various individuals located at these nursing homes.  Defendant **SCOTT GREEN** provided Hartley with some of the information necessary to file a claim: the patient name, the purported treatment provided, the date on which the purported treatment was provided, and the provider name to be used in connection with these claims.

10.    Defendant **SCOTT GREEN**'s illegal activities relate to his fraudulent billings using the PINs of two licensed medical providers: Mitchell Pulver, M.D., and Louis Frank, Ed.D. who are identified in the Information as "Dr. A" and "Dr. B," respectively.

### A.    Defendant SCOTT GREEN's fraudulent billings using Dr. Mitchell Pulver's name and PIN

11.    On July 8, 1999, defendant **SCOTT GREEN** met for the first time with Dr. Mitchell Pulver, who was a licensed psychiatrist.  During that meeting, defendant **SCOTT GREEN** asked Dr. Pulver to supervise his work.  Defendant **SCOTT GREEN** explained to Dr. Pulver that **GREEN** had previously been supervised by a psychiatrist who was no longer supervising **GREEN**.  Defendant **SCOTT GREEN** told Dr. Pulver that he was not able to be paid by Medicare on his own, and that he needed physician supervision in order to be reimbursed for his services.  Defendant **SCOTT GREEN** also told Dr. Pulver that **GREEN** had his own billing service and would submit his own claims.  Dr. Pulver agreed to supervise defendant **SCOTT GREEN** in exchange for receiving a percentage of the Medicare billing receipts that defendant **GREEN** was to receive in connection with these patients.  It was understood by Dr.

2

Pulver that **GREEN** would follow Medicare regulations in his billings. Upon request from defendant **SCOTT GREEN**, Dr. Pulver provided Debra Hartley, the GPA billing agent, with his Medicare PIN, which **GREEN** said was needed to bill Medicare for **GREEN**'s services.

12.    Defendant **SCOTT GREEN** caused Dr. Pulver's name and PIN to be used in connection with Medicare claims being submitted on behalf of certain patients. Notwithstanding the fact that defendant **SCOTT GREEN** had not met Dr. Pulver until on or about July 8, 1999, defendant **SCOTT GREEN** caused Dr. Pulver's name and PIN to be used in connection with Medicare claims for purported patient treatments that were rendered months before defendant **SCOTT GREEN** had ever met Dr. Pulver (beginning on April 20, 1999).

13.    At no time was defendant **SCOTT GREEN** eligible to receive Medicare reimbursements for any treatments he provided to his patients. Although at times defendant **SCOTT GREEN** discussed cases and specific issues about the patients with Dr. Pulver, defendant **SCOTT GREEN** was not personally and directly supervised by Dr. Pulver on-site when meeting with the patients, nor was defendant **GREEN** employed by Dr. Pulver (nor was defendant **GREEN** employed by an entity that employed Dr. Pulver).

14.    Beginning on July 20, 1999, and continuing thereafter through and including September 14, 1999, defendant **SCOTT GREEN** caused Medicare claims to be submitted using Dr. Pulver's name and PIN. Some of these claims were materially false and fraudulent in that the claims inflated the number of hours and visits on which defendant **SCOTT GREEN** had rendered psychological services to the patients. The other claims were improper in that, while defendant **SCOTT GREEN** may have provided treatments to certain patients, the circumstances underlying these claims did not satisfy Medicare's reimbursement regulations. In total, defendant **SCOTT GREEN** caused 588 claims using Dr. Pulver's name and PIN to be submitted, which resulted in Medicare issuing payments totaling $20,090.82.

15.    In or about August 1999, Dr. Pulver received the first two checks from Medicare for services that had been billed by defendant **SCOTT GREEN** using Dr. Pulver's name and PIN. Despite having some concerns about whether Medicare had been billed correctly, Dr. Pulver wrote a personal check to defendant **SCOTT GREEN** for the funds. Because of his concerns about whether the services were properly billed to Medicare, Dr. Pulver did not cash these two checks, which totaled $7,928.07.

16.    On or about September 12, 1999, Dr. Pulver met with defendant **SCOTT GREEN**. Dr. Pulver advised defendant **SCOTT GREEN** that he thought the regulations did not sufficiently detail the procedures that applied to supervising and billing a non-physician. Dr. Pulver told defendant **SCOTT GREEN** that he would contact Medicare the next day for clarification. Dr. Pulver endorsed and gave various Medicare checks to defendant **SCOTT GREEN**. In so doing, it was Dr. Pulver's understanding that **GREEN**'s acceptance of the checks was contingent upon the billings being in compliance with Medicare's regulations.

3

17.    On or about September 13, 1999, Dr. Pulver contacted Medicare to verify whether defendant **SCOTT GREEN**'s billings were in compliance with applicable regulations. On or about September 15, 1999, Dr. Pulver learned from a Medicare representative that the billings submitted by defendant **SCOTT GREEN** for purported treatments by a non-physician were not permitted by Medicare regulations and that the funds needed to be returned.

18.    On or about September 15, 1999, Dr. Pulver had a discussion with defendant **SCOTT GREEN,** in which Dr. Pulver advised defendant **SCOTT GREEN** that defendant **SCOTT GREEN** was not following the applicable Medicare regulations in connection with his billings. Dr. Pulver told defendant **SCOTT GREEN** that the funds received from Medicare using Dr. Pulver's name and PIN needed to be returned. Because his name and PIN was used in connection with defendant **SCOTT GREEN**'s bills, Dr. Pulver paid back to Medicare $18,433.87 (which sum included the two uncashed Medicare checks worth $7,928.07 and personal checks from Dr. Pulver totaling $10,515.80) in connection with these claims. Defendant **SCOTT GREEN** promised to reimburse Dr. Pulver in full, and ultimately repaid Dr. Pulver approximately $11,000.

### B.    Defendant SCOTT GREEN's fraudulent billings using Dr. Louis Frank's name and PIN

19.    In addition to using Dr. Pulver's name and PIN to bill Medicare, defendant **SCOTT GREEN** also used the name and PIN of another licensed medical provider, Dr. Louis Frank, in connection with the submission of false claims to Medicare.

20.    In or about the end of August 1998, defendant **SCOTT GREEN** met with Dr. Louis Frank, a licensed psychologist, who agreed to supervise **GREEN** in return for 7% of the Medicare receipts that **GREEN** received in connection with these patients. They agreed to have regular supervised meetings to discuss cases and specific issues and did in fact meet on a regular basis from roughly January 1999 through February 2000. Defendant **SCOTT GREEN** asked Dr. Frank to provide Debra Hartley with his Medicare PIN, which Dr Frank did. Dr. Frank asked for and received assurances that **GREEN** would use Dr. Frank's PIN only to indicate that Dr. Frank was supervising his work. On or about March 14, 2000, Dr. Frank sent defendant **SCOTT GREEN** a certified letter formally notifying **GREEN** that he was terminating their arrangement.

21.    Notwithstanding his discussions with Dr. Frank, defendant **SCOTT GREEN** caused false and fraudulent claims to be submitted to various health care programs, including Medicare, using Dr. Frank's name and PIN. As described earlier in connection with Dr. Pulver, defendant **SCOTT GREEN** caused Medicare claims to be submitted in Dr. Frank's name. Defendant **SCOTT GREEN** also caused Dr. Frank's PIN to be used in connection with these claims. Defendant **SCOTT GREEN** caused Medicare claims to be submitted in this manner both before, and after, his discussion with Dr. Pulver on September 15, 1999.

22.    At no time was defendant **SCOTT GREEN** eligible to receive Medicare reimbursements for any treatments he provided to his patients. Although at times defendant **SCOTT GREEN** met with Dr. Frank and discussed cases and specific issues about the patients, defendant **SCOTT GREEN** was not personally and directly supervised by Dr. Frank on-site when meeting with the patients, nor was defendant **GREEN** employed by Dr. Frank (nor was he employed by an entity that employed Dr. Frank).

23.    As with the claims submitted using Dr. Pulver's name and PIN, some of claims that defendant **SCOTT GREEN** caused to be submitted using Dr. Frank's name and PIN were false in that they were for purported psychotherapy treatments that defendant **SCOTT GREEN** had not, in fact, provided on the dates and to the patients indicated on the claims. Additionally, the claims falsely inflated the number of hours spent treating the patients.

24.    On or about May 12, 1999, and in furtherance of his fraudulent activities, defendant **SCOTT GREEN** applied for a post office box in the name of Geri-Psychiatric Associates, LLC in Braintree, Massachusetts, and was assigned Post Office Box 850639. This post office box was under the exclusive control of defendant **SCOTT GREEN.**

25.    On or about June 3, 1999, defendant **SCOTT GREEN** caused to be submitted to National Heritage a Change of Information form for Medicare/Federal Health Care Providers that stated that Dr. Louis Frank's mailing address and billing address was P.O. Box 850639, Braintree, Massachusetts. As a result of these forms, National Heritage mailed reimbursement checks relating to the Medicare claims submitted in Dr. Frank's names to defendant **SCOTT GREEN** at this address.

26.    Upon receipt of the proceeds he received from Medicare, defendant **SCOTT GREEN** deposited those checks into checking accounts under his control, including a GPA checking account and a checking account that defendant **SCOTT GREEN** had previously opened under the name of "Benjamin Cooper."

27.    In sum, defendant **SCOTT GREEN** caused Debra Hartley to submit approximately 2,678 Medicare claims to National Heritage using Dr. Pulver's and Dr. Frank's names and PINs. Some of the claims sought reimbursement for psychotherapy services when, in fact, no such treatments had been provided to the patients on the dates set forth in the claims. Others of the claims falsely inflated the number of hours a given patient had been seen. All of the claims were improper in that, while defendant **SCOTT GREEN** may have provided treatments to certain patients, the circumstances underlying these claims did not satisfy Medicare's reimbursement regulations. As a result of these 2,678 claims, National Heritage issued payments totaling $93,562.87 on behalf of the Medicare program, which were sent to defendant **SCOTT GREEN** via the United States mail. After accounting for the $18,443.87 repaid by Dr. Mitchell Pulver, this resulted in the Medicare program suffering losses of $75,119.00

5

III.    TOTAL FRAUD LOSS FOR PURPOSES OF SENTENCING GUIDELINES
ANALYSIS (ESTIMATED BETWEEN $30,001 AND $70,000)

28.    The Government in this case estimates that the total criminal fraud loss for which
defendant **SCOTT GREEN** should be held accountable in this case is between $30,001 and
$70,00.  In determining defendant **SCOTT GREEN**'s criminal fraud loss, the Government first
sought to identify the total number of Medicare claims that defendant **SCOTT GREEN** caused
to be submitted.  From that total number of claims, the Government then sought to distinguish
between three different groups of Medicare claims:

(a)    claims that were for instances in which (1) defendant **SCOTT GREEN**
rendered actual treatments and (2) defendant **SCOTT GREEN** actually
consulted with Dr. Pulver or Dr. Frank concerning the treatment rendered,
but (3) the claims were improper in that the claims did not comply with
Medicare's billing requirements; and (4) the Government had no evidence
suggesting that defendant **SCOTT GREEN** knew that the claims were
improper and/or did not otherwise comply with Medicare's billing
requirements;

(b)    claims that were for instances in which (1) defendant **SCOTT GREEN**
rendered actual treatments, and (2) defendant **SCOTT GREEN** actually
consulted with Dr. Pulver or Dr. Frank concerning the treatment rendered,
but (3) the claims were improper in that the claims did not comply with
Medicare's billing requirements; and (4) the Government had evidence
suggesting that defendant **SCOTT GREEN** knew that the claims were
improper in that they did not otherwise comply with Medicare's billing
requirements; and

(c)    claims that were for instances in which (1) defendant **SCOTT GREEN**
falsely represented that he had rendered services when no such services
were rendered and/or (2) defendant **SCOTT GREEN** falsely represented
the length and/or type of services rendered.

With respect to the latter two categories, the Government submits that these claims represent the
defendant's criminal conduct and should be considered in determining the total fraud loss;
however, with respect to the first category (involving actual treatment rendered by **SCOTT
GREEN**, consultations with Dr. Pulver and/or Dr. Frank, and no evidence of knowledge of
wrongdoing by defendant **SCOTT GREEN**), the Government recognizes existing caselaw
holding that these claims should not be considered in determining fraud loss. *See, e.g., United
States v. Shaefer*, 291 F.3d 932, 937-941 (7th Cir. 2002)  (losses included in fraud loss
calculation must be as a result of criminal conduct).

29.     To determine the total fraud loss caused by defendant **SCOTT GREEN**'s actions, a special agent with the Office of Inspector General at the Department of Health and Human Services reviewed the individual Medicare claims and reimbursements that were submitted to National Heritage using the names and PINs of Dr. Mitchell Pulver and Dr. Louis Frank. This list contained legitimate claims and reimbursements submitted by the providers as well as the fraudulent claims submitted by Hartley on defendant **SCOTT GREEN**'s behalf. To separate out the defendant's claims from the doctors' legitimate claims, the agent then took the following steps. With respect to these claims, the agent contacted Hartley and obtained a list of GPA patient names recorded by Hartley in her Accounts Receivable Binder. The agent then compared this list of GPA patient names against the names of beneficiaries appearing on Medicare claims paid by National Heritage using Dr. Pulver's or Dr. Frank's PINs. Since neither Dr. Pulver nor Dr. Frank relied upon GPA for submitting claims in connection with treating their own patients, the agent attributed to defendant **SCOTT GREEN** all of the claims and reimbursements associated with those patients who both appeared on the GPA list and were billed to Medicare using either Dr. Pulver's or Dr. Frank's PIN.

30.     From this reviews, the agent was able to determine that defendant **SCOTT GREEN** caused Debra Hartley to submit approximately 2,678 Medicare claims to National Heritage using Dr. Pulver's and Dr. Frank's names and PINs. Pursuant to Medicare's claim requirements, each of these claims represented either that the providers whose PINs were set forth on the claims had personally performed psychotherapy services in connection with the specified nursing home patients or that the providers had directly and personally supervised the treatments. Some of the claims sought reimbursement for psychotherapy services when, in fact, no such treatments had been provided to the patients on the dates set forth in the claims and others of the claims falsely inflated the number of hours defendant **SCOTT GREEN** had spent with a given patient. All of these claims were improper in that the circumstances underlying the claims did not comply with Medicare's billing requirements. As a result of these improper and/*or* fraudulent claims, National Heritage issued payments on behalf of the Medicare program totaling $93,562.87. After accounting for the $18,443.87 repaid by Dr. Mitchell Pulver, this resulted in the Medicare program suffering losses of $75,119. A summary of this conclusion is set forth below:

| Doctor Name and PIN | Total Number of Medicare Claims Submitted during Time Period | Number of Claims Attributable to **SCOTT GREEN** | Dollar Value of Reimbursements Paid by Medicare |
|---|---|---|---|
| Dr. Pulver | 1,557 claims | 588 claims | $20,090.82 |
| Dr. Frank | 2, 316 claims | 2,090 claims | $73,472.05 |
| **TOTAL** | **3,873 claims** | **2,678 claims** | **$93,562.87** |

Losses Resulting from Fraudulent Claims Using Dr. Frank's PIN

31.     The Government estimates that defendant **SCOTT GREEN** knowingly and intentionally caused losses to the Medicare Program somewhere in excess of $43,037.21 while using Dr. Louis Frank's PIN.

32.     The Government has no evidence establishing that, at the outset of his relationship with Dr. Louis Frank, defendant **SCOTT GREEN** knew and understood that it was not permissible to bill the Medicare Program for claims involving actual treatments rendered by defendant **SCOTT GREEN** in which defendant **SCOTT GREEN** consulted with and reviewed the course of treatment with Dr. Frank.  However, by some point in time and not later than June 3, 1999 (when defendant **SCOTT GREEN** surreptitiously submitted a  National Heritage a Change of Information form for Medicare/Federal Health Care Providers changing Dr. Louis Frank's mailing address and billing address to the mail box defendant **SCOTT GREEN** opened under the name of "Benjamin Cooper,"), the evidence suggests that defendant **SCOTT GREEN** became aware that his conduct was not authorized. After on or about June 3, 1999, defendant **SCOTT GREEN** caused the Medicare Program to pay claims totaling $43,037.21 using Dr. Frank's PIN.  This figure consists both of payments for fraudulent claims for which no services were rendered and for improper claims for which services were rendered but were not eligible for reimbursement pursuant to Medicare's regulations.  (On or after September 15, 1999, the total dollar figure of Medicare claims that defendant **SCOTT GREEN** caused to be submitted and paid using Dr. Frank's PIN totaled $24,912.41.)

33.     With respect to the claims (which totaled $30,434.84) that defendant **SCOTT GREEN**, using Dr. Frank's PIN,  caused the Medicare Program to pay prior to June 3, 1999, there is no question that some of those claims were knowingly false and fraudulent in that they represented (as defendant **SCOTT GREEN** has admitted) claims for which no services were rendered and/or claims that falsely represented the length and type of treatments rendered. However, the evidence also suggests that some other portion of those claims represented actual treatments rendered by defendant **SCOTT GREEN** with consultations between **GREEN** and Dr. Frank.  It is difficult, if not impossible, to determine with respect to any given claim during this time period whether it represents an actual treatment rendered by defendant **SCOTT GREEN** or whether it represents a claim in which no services were rendered.

Losses Resulting from Fraudulent Claims Using Dr. Pulver's PIN

34.     The Government estimates that defendant **SCOTT GREEN** should be held accountable for $1,656.95 in losses to the Medicare Program and $7,928.07 in losses to Dr. Mitchell Pulver while using Dr. Pulver's PIN.

35.     All of the claims (totaling $20,090.82) submitted using Dr. Pulver's PIN were submitted after June 3, 1999, and therefore could potentially be considered within the loss calculation.  However, Application Note 3(E)(i), U.S.S.G. § 2B1.1 (Nov. 1, 2004), provides that

8

money returned to the victim before the offense was detected should not be included in the loss calculation. Here, as discussed, Dr. Pulver, on his own initiative, discovered that the Medicare program did not allow for claims for treatments rendered by a Mental Health Counselor unless the Mental Heath Counselor was both acting under the direct supervision of Medicare-eligible medical providers and was employed either by the provider or by the legal entity employing the provider. Because Dr. Pulver's arrangement with defendant **SCOTT GREEN** did not meet these requirements, Dr. Pulver returned two uncashed Medicare checks totaling $7,928.07 to the Medicare program and paid $10,515.80 to the Medicare program using his own personal checks. In sum, Dr. Pulver returned to the Medicare Program $18,433.87. Defendant **SCOTT GREEN,** who had received the proceeds from all the claims including the $7,928.07 represented by the two uncashed Medicare checks, subsequently repaid Dr. Pulver roughly $11,000. As a result, Dr. Pulver lost $7,928.07 as a result of defendant **SCOTT GREEN**'s criminal conduct and the Medicare Program lost $1,656.95.

### Total Estimated Losses Resulting from Defendant's Criminal Conduct

36.     The Government submits that the evidence supports an estimate that the defendant knowingly and intentionally caused a fraud loss of between $30,001 and $70,000. As discussed above, the evidence supports the conclusion that at least $43,037.21 of the losses to the Medicare Program using Dr. Frank's PIN were knowing and intentional. (As previously stated, this figure includes both fraudulent claims for which services were falsely represented and/or inflated and includes improper claims relating to actual services provided that were not reimbursable by the Medicare Program.) Similarly, the losses incurred by Dr. Pulver ($7,928.07) and to the Medicare Program from the defendant's use of Dr. Pulver's PIN ($1,656.95) are also directly attributable to the defendant. Together, these losses total $52,622.23. Additionally, the Government submits that the evidence supports the conclusion that some portion of the remaining $30,434.80 in claims paid by Medicare (prior to June 3, 1999) using Dr. Frank's PIN should also be counted, as they represent claims that did not accurately reflect treatments that were actually rendered. However, the Government has no means by which to establish that at least $17,377.77 of those claims were in fact fraudulent claims.[1]    Because of this, the Government believes that a conservative estimate of the losses caused by defendant's criminal conduct is best captured by the $30,001 - $70,000 range.

37.     For several reasons, including those already stated, the Government believes that the estimated fraud loss of between $30,001-$70,000 is a fair, yet conservative estimate of fraud loss. Although the Government has some evidence indicating that Defendant may have engaged in further criminal activity, this evidence is not compelling and does not alter this estimate. For example, Debra Hartley indicated that claims filed at the direction of defendant **SCOTT GREEN** exceeded the number of claims identified by the agent in this case. Her records

---

[1]    In order to hold the defendant accountable for $70,000 or more in losses, the Government would need to establish that at least $17,377.77 ($70,000 minus $52,622.23) of these claims were fraudulent.

included claims submitted to private insurance carriers, which the agent, because of the small number of claims to each carrier, did not review. Additionally, a third physician, Dr. Frederick Burrage, informed the Government that he believed that defendant **SCOTT GREEN** may also have submitted false inflated billings using Dr. Burrage's PIN. Dr. Burrage was a licensed psychologist who began working at GPA in early 1998. Dr. Burrage was hired by defendant **SCOTT GREEN** to provide psychological services Bay Point Rehabilitation. On two separate occasions, defendant **SCOTT GREEN** asked Dr. Burrage to supervise his work; both times, Dr. Burrage refused to do so. During the investigation, Dr. Burrage personally reviewed GPA Medicare invoices that were submitted using Dr. Burrage's PIN. Dr. Burrage identified seven (7) Medicare claims submitted by Hartley for which Medicare paid a total of $409.35. Dr. Burrage indicated that the individuals identified in these claims were not his patients and that he had not provided the services indicated in the claims. Dr. Burrage further expressed his belief that, with respect to certain of his patients, there may be more claims for the given patients than treatment sessions provided by Dr. Burrage with those patients. Dr. Burrage also indicated that several of the claims with respect to Dr. Burrage's patients appeared to misrepresent the actual services provided by Dr. Burrage and appeared to be "upcoded" (*i.e.*, the type and length of treatments were misrepresented so as to allow for greater reimbursement than the claims would otherwise receive), thus causing Medicare to have paid more monies than the program should have paid had the treatments been accurately described. Because (1) it was extremely difficult, if not impossible, to determine the accuracy of this allegation, (2) the defendant denied having engaged in this conduct, and (3) it did not appear that this would affect the guideline range (loss between $30, 001 and $70,000), the Government has not pursued this and is not including this activity in its loss estimate.

10